OPINION OF THE COURT
Charles J. Markey, J.
A dog is known as “man’s best friend.” The present case demonstrates that, in American culture^ at least, the feelings of affection and loyalty are amply reciprocated. The effort to avoid hitting a stray canine that was wandering on a major New York City highway led to a five-car pileup. The multiple summary judgment motions at issue in this case,now try to allocate the financial consequences of our love and protection of canines. The dog apparently escaped uninjured, but the plaintiff claims that he sustained “serious injury,” several novel issues of which are the principal focus of this opinion.
Specifically, at issue in this case are the questions, starting to gain increasing attention, of whether lost exercise and recreational opportunities are compensable as a “serious injury” under Insurance Law § 5102 (d), whether a gap in treatment alone suffices to justify dismissal of a plaintiffs action, and the type of proof that plaintiff must present in order to avoid summary judgment.
The discussion of the salient facts regarding the vehicular pileup are based on the court’s reading' of all of the deposition transcripts submitted as exhibits to the multiple motions. A *851 multivehicle accident occurred on the eastbound lanes of the Grand Central Parkway, in Queens County, on August 10, 1996, at about 5:00 p.m. (deposition transcript of plaintiff Kevin C. Panchmia at 8, 16). The Grand Central Parkway, at the area of the accident, had six lanes, with a concrete divider separating the three westbound lanes from those heading eastbound (deposition transcript of defendant Albert Sun at 9; deposition transcript of defendant Joshua Tauber at 37). According to the police accident report, Sun states that he stopped for a dog on the road. At the depositions, one of the issues arose whether the canine was a “medium[-]size[d]’’ (Sun deposition transcript at 44) or “big dog” (deposition transcript of defendant Stephen Vingiello at 14, 27). The dog was simply walking across, from right to left, on the eastbound lanes of this very busy and multilane highway (Sun deposition transcript at 14).
Sun’s car, indeed, stopped twice. The first time he stopped was in response to the fact that the two cars in front of him stopped for “a good minute or so” to let the dog pass to the shoulder of the road. The accident at issue occurred when the dog started to walk the highway a second time, ambling onto the right lane (id. at 16-18). At any rate, when Sun’s vehicle stopped for the second time, Vingiello’s car hit it. Panchmia’s car then hit Vingiello’s vehicle. Tauber’s car then hit Panchmia’s automobile. Behind Tauber’s car was that operated by defendant Lucy Bilka. Three other parties named in the caption were operating vehicles on the road and were allegedly involved: defendant Vivian Gaona, who is not involved in the current motions and who is Bilka’s cousin, and defendants Eileen Blake and Robert McClain, who have not appeared.
Vingiello, at his deposition testimony, testified that there was a “string” of several cars involved, and the scene of the pileup resembled vehicles “squeez[ed3” together like “an accordion” (Vingiello deposition transcript at 19, 25, 28). At least five or six tow trucks, several ambulances, and fire engines responded to the accident scene (id. at 18, 21-22). The confusion was further enhanced by the fact that the police gave chase in an effort to apprehend the undoubtedly frightened dog, which “was virtually going in circles” (id. at 14, 26-27). The police eventually caught the “big dog, German Shepherd” dog (id. at 14), and it is unknown whether the dog was a stray, owned, or sadly and cruelly abandoned near the road. Upon the canine’s apprehension, the first motorist, in the first car preceding Sun’s vehicle, yelled to police, identifying the dog as the one causing him to swerve (id.).
*852 The court has one motion and four cross motions. Sun moves for summary judgment on the issue of liability. Tauber cross-moves for summary judgment on both liability and the “threshold” issue of serious injury. Vingiello cross-moves for summary judgment on liability. Bilka cross-moves for summary judgment on the issue of liability. Plaintiff Panchmia cross-moves for summary judgment against Tauber on liability and on the issue of serious injury.
First, the only party contesting dismissal of all claims against Bilka is Tauber. Both Panchmia and Vingiello consent to dismissal of the case against her. The court’s review of the deposition transcripts reveals that no impact cjccurred between Bilka’s vehicle and those of the other partiek Bilka’s car was only “tapped” by the vehicle of her cousin, Gaona. Bilka’s cross motion for summary judgment is granted in all respects and the case, including all cross claims, is dismissed as to her.
As to the motions by the other defendants and the plaintiff on the issue of liability, this court has independently canvassed the cases, focusing on automobile accidents caused by attempts to avoid striking an animal (see, Glenn, Annotation, Automobiles: Liability of Motorist for Collision as Affected by Attempts to Avoid Dog or Other Small Animal in Road, 41 ALR3d 1124 [1972]). This court finds persuasive! the reasoning of the Supreme Court of Minnesota in Kuether v Locke (261 Minn 41, 47, 110 NW2d 539, 544 [1961]), holding that the liability issue is a fact question for the jury (accord, Massie v Barker, 224 Mass 420, 423, 113 NE 199, 200 [1916]; Becker v Beir, 275 App Div 146, 147 [4th Dept 1949]).
This court thus denies the summary judgment motions by Sun, Tauber, Vingiello, and Panchmia on the issue of liability.
The next battle pits the cross motions by Panchmia and Tauber on the issue of “serious injury.” A few matters on this issue warrant comment. Panchmia contends that he had been training to be a trader. Tauber’s counsel questions Panchmia’s veracity on whether he was employed at the time of the accident. This matter is obviously one for the jury.
Tauber then argues that a six-year gap in treatment should bar Panchmia’s claims. The accident occurred on August 10, 1996. Tauber appended an unsigned Au!gust 21, 1996 report of Dr. Karl Hussman stating that magnetic resonance imaging (MRI) was performed on Panchmia on August 20, 1996 and no disc bulges, herniations, or other abnormalities are detected. In 2002, Tauber maintains, Panchmia was treated by Dr. Gerald H. *853 Klingon and Dr. Mitchell E. Levine. Citing a six-year gap in treatment, Tauber requests dismissal of Panchmia’s case.
First, as a factual matter, the court rejects this argument. Appended to Tauber’s own motion are treatment reports showing that Panchmia intermittently sought treatment during the year 1997 and 2000. The fact that these medical reports were attached to defendant’s moving papers and are thus being offered initially by defendant exempts plaintiff from securing and providing them in admissible form (see, Perry v Pagano, 267 AD2d 290 [2d Dept 1999] [if a defendant relies on a particular, unsworn MRI report, plaintiff can do the same]).
As to Tauber’s legal contention, the “gap in treatment” defense is not of legislative creation and is not mentioned in Insurance Law § 5102 (d). It was created by the judiciary as a means of sifting through the thousands of vehicular, personal injury cases confronting the courts. The defense is not to be invoked mindlessly, but, as with other judicial concepts, is to be weighed with the provident exercise of discretion (see, e.g., Brown v Dunlap, 6 AD3d 159 [1st Dept 2004] [3-2 split on “gap in treatment” defense]). Second, the cases that dismiss a plaintiff’s case consistently refer to an “unexplained gap in treatment” (see, e.g., Shinn v Catanzaro, 1 AD3d 195, 199 [1st Dept 2003]). Third, courts will excuse the alleged gap where treatment would be futile, such as in the case of injuries, attested to by a doctor, to be permanent in nature (see, Taker v Valerio-Mena, 195 Misc 2d 687, 688 [Civ Ct, Queens County 2003]).
Fourth, no court has ever employed, to this court’s research, the gap in treatment defense alone to dismiss a case, but has also found some other reason, combined with a gap in treatment, to justify dismissal (see, e.g., Kauderer v New York City Tr. Auth., 306 AD2d 319 [2d Dept 2003]; Crespo v Kramer, 295 AD2d 467 [2d Dept 2002]; Taylor v Jerusalem Air, 280 AD2d 466 [2d Dept 2001], lv denied 96 NY2d 716 [2001]; Pierre v Nanton, 279 AD2d 621 [2d Dept 2001]; Paulino v Xiaoyu Dai, 279 AD2d 619 [2d Dept 2001]; Betheil-Spitz v Linares, 276 AD2d 732 [2d Dept 2000]; Slasor v Elfaiz, 275 AD2d 771 [2d Dept 2000]; Reynolds v Cleary, 274 AD2d 509 [2d Dept 2000]; Barrow v Budhu, 2 Misc 3d 133[A], 2004 NY Slip Op 50182[U] [App Term, 1st Dept 2004] [per curiam]).
Finally, a plaintiff should be free to explain a gap in treatment based on impecuniousness (see, Rodriguez v Yong Wan Oh, Civ Ct, Queens County, July 1, 2002, Index No. 2221 QTS *854 2001, Markey, J., affd on other grounds 2 Misc 3d 134[A], 2004 NY Slip Op 50208[U] [App Term, 2d Dept 2004] [courts should be sensitive to the economic realities that force injured persons who need health care services to make the hard choice of suddenly terminating physical therapy or another course of treatment because they simply can no longer afford to do so]).
In the present case, defendant Tauber’s own proof shows that his reliance on the “gap in treatment” ‘defense is unsound.
Putting aside whether Panchmia was working at the time of the accident and lost two months of work, he claims that he lost his customary recreational activities. He states, in his affidavit, that because of his regular, daily lower back pain, he could no longer regularly participate in recreational activities, including “lifting weights at a gym several times per week. Since the accident [now a period of eight years], I have not been able to lift weights” (Panchmia affidavit at 3). In his examination before trial, also read in its entirety by the court, plaintiff testified that he was not able to use the many types of exercise equipment that he kept at his home, including “[f]ree weights, dumbbells, leg lifts, treadmill, exercise bike, [and free weight] bench” (Panchmia deposition transcript at 134). Tauber disagrees that lost exercise is compensable.
To resolve the issue, Insurance Law § 5102 (d) requires that a plaintiff miss “substantially all” of his customary daily activities for 90 out of the 180 days following the accident. The activities described by Panchmia are not some generalized statements about lost social and recreational activities. He describes with sufficient detail how he participated in active exercise with great regularity and not some simple “pickup” game of basketball (compare Bonilla v Bromfield, 2002 NY Slip Op 50209[U] [Civ Ct, Queens County 2002] [regular cardio-fitness exercise], and Andoh v Milano, 271 AD2d 358, 359 [1st Dept 2000] [plaintiff proved “consequential limitation of activity, especially recreational activity”], with Cooper v Dunn, 2001 WL 138864, *11, 2001 US Dist LEXIS 881, *35 [ED NY, Jan. 2, 2001] [inability to play a pickup game of basketball or do pushups are not compensable losses]). When physicians, health providers, and insurance companies are trying to encourage millions of sedentary folk to participate in regular exercise, thereby also reducing health care costs, a court should not marginalize such activity by ruling that it is not actionable as a matter of law. Panchmia’s lost exercise and recreational activities are potentially compensable and raise an issue of fact.
*855 The final issue of “serious injury” involves the collection of proof offered by plaintiff, in his cross motion for summary judgment, and, more to the point, essential items that he has withheld or omitted. Unless the “door has been opened” by a defendant’s reliance on an item of proof not offered in proper form (see, Perry v Pagano, 267 AD2d 290 [1999], supra), the plaintiff must marshal the proof of “serious injury” in admissible form (see, Wagman v Bradshaw, 292 AD2d 84 [2d Dept 2002] [treating chiropractor should not have been allowed to testify as to contents of an inadmissible report interpreting MRI films, prepared by another health care professional who did not testify, when the MRI films were not in evidence, and without proof that, as hearsay material, the written MRI report was reliable]).
In the present case, defendant produced the contemporaneous MRI, taken 10 days after the accident, on August 20, 1996, showing absolutely no injury or abnormality. Dr. Klingon refers to the 1996 MRI, but fails to explain why no herniation, bulge, or other abnormality was uncovered. More important, Dr. Klingon, states in his affirmation, incorrectly dated June 21 or 22, 2001, that, in January 2002, he advised Panchmia to get further MRI studies of his cervical and lumbar spine (Klingon affirmation at 6-7). In a photocopied and faxed signature page, Dr. Klingon states, directly above his signature, that — on November 4, 2003 — he reviewed “an MRI” of Panchmia’s cervical spine dated April 30, 2002, and “[a] lumbar MRI” dated March 30, 2002.
The alleged 2002 MRI of the cervical spine supposedly reveals a lordosis due to muscle spasm and disc herniation. The 2002 MRI of the lumbar spine reportedly reveals a disc herniation. Klingon fails to state whether he reviewed MRI reports or the actual films.
First, as to plaintiffs presentation, obviously a doctor’s affirmation dated June 2001 can hardly be probative of events that it reports occurred during 2002 and 2003. The court will chalk the mishap to counsel’s error, since the fax of the last page of the Klingon affirmation shows its transmission by fax on November 18, 2003, at 4:09 p.m., and plaintiffs notice of motion was dated November 19, 2003 (see, Palumbo v Ho, 2002 NY Slip Op 50248[U] [Civ Ct, Queens County 2002] [in meeting court deadlines, plaintiffs counsel, in personal injury cases, will often suggest changes to plaintiffs health care providers, thus resulting in a faxed, photocopied signature page of a physician’s affirmation or a chiropractor’s affidavit]).
*856 The latitude given to the plaintiffs bar, discussed in Palumbo, in light of the severed hurdles necessary to overcome a threshold motion under Insurance Law § 5102 (d), is not meant as a license for general sloppiness. In the present case, Dr. Klingon, supervised by plaintiffs counsel, should have corrected or amended the date of his affirmation. The court, at any rate, excuses the lapse regarding the date of the affirmation.
The more serious issue, and one correctly identified by John Moroney, Esq., in his affirmation in opposition on behalf of Tauber to plaintiffs cross motion, is the failure by Panchmia to submit even one of the three MRI reports that were allegedly taken. Tauber’s counsel, as stated, produced the first MRI report, showing no injury or abnormalities. Plaintiff had the responsibility of producing the two MRI reports taken in 2002 in admissible form, or, at least, producing the two 2002 reports supplemented by a recitation by Dr. Klingon that he reviewed the films of the report. Dr. Klingon states only that he reviewed the two 2002 MRIs, without specifying whether he simply read the radiologists’ reports — evident hearsay under Wagman — or read the films. The bottom line is that if Dr. Klingon had, indeed, reviewed the MRI films allegedly taken in 2002, Dr. Klingon should have stated so unequivocally, and copies of the MRI reports of the alleged two 2002 studies should have been appended as exhibits, preferably in admissible form (see, Wagman v Bradshaw, supra).
Recently, a majority of a sharply divided bench of the Appellate Division, First Department, in Pommells v Perez (4 AD3d 101 [2004] [3-2 decision] [notice of appeal filed on Mar. 4, 2004, and awaiting expedited review pursuant to Rules of Court of Appeals (22 NYCRR) § 500.4]), held that, in addition to a gap in treatment (at 102), “there [was] no admissible evidence of serious injury at the time of the accident” and a reliance on minimal restrictions of motions discovered only four years after the accident. In the present case, the only MRI report produced to the court — that taken only 10 days after the accident — reveals that there was no injury to plaintiffs cervical; spine, and Dr. Klingon, in his affirmation, although pointing to an alleged 2002 MRI showing a disc herniation to the cervical spine, fails to explain how the 1996 MRI report would have come to a conclusion of absolutely no abnormality to the cervical spine (see, Brown v Dunlap, 6 AD3d 159 [2004] [3-2 decision), supra [no effort made by plaintiffs physician to address earlier MRI report showing only changes in disc dessication that were chronic and degenerative in origin]).
*857 Even if this court were not to consider the rulings by a sharply divided First Department bench in Pommells v Perez (4 AD3d 101 [2004], supra), awaiting expedited review by the New York Court of Appeals, and Brown v Dunlap (6 AD3d 159 [2004], supra), the outcome in the present case would not change. In Shinn v Catanzaro (1 AD3d 195 [2003], supra), there was a 4V2-year gap or lapse in treatment together with a failure to diagnose alleged herniated discs until five years after the accident. The Appellate Division, First Department, in Shinn, held that, under such circumstances, the plaintiffs expert’s attribution of causality of the herniated discs to the accident was conclusory and failed, as a matter of law, to prove causation (id. at 198-199; accord, Pajda v Pedone, 303 AD2d 729 [2d Dept 2003] [expert’s opinion of causation was mere speculation, where, among other lapses, plaintiff failed to submit medical proof taken near the time of the accident to show injuries]).
The Shinn case has striking applicability. In the present case, Dr. Klingon — whether his submitted affirmation was prepared and signed in 2001, 2002, or 2003 — does not even make a pronouncement on causation on the allegedly newly discovered disc herniation and injury to the lumbar spine. Even if the court were to consider his generalized statement on the typed page, preceding the faxed addition, that “[t]he accident of August 10, 1996 is held to be the competent producing cause of the conditions described,” such a simplified, conclusory pronouncement is too weak to demonstrate causation. Plaintiffs presentation, in short, lacks the sinewy strength to overcome the threshold motion.
The court, accordingly, grants the branch of defendant Tauber’s cross motion for summary judgment on the issue of serious injury and denies the branch of the plaintiffs cross motion for summary judgment on the issue of serious injury. In light of this disposition, and despite the failure by the other codefendants to join formally in the branch of the Tauber cross motion seeking summary judgment on the threshold issue, the complaint is dismissed.
The court notes, in addition, that this case has previously been marked off the trial calendar, a point made moot by the action’s dismissal.